UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| ASR-8 CENTRE LP, et al.[1] | § | Case No. 14-30174 |
| | § | |
| DEBTORS. | § | (Jointly Administered) |

MOTION OF SENIOR LENDERS FOR AN ORDER
TERMINATING THE EXCLUSIVE PERIODS DURING
WHICH ONLY THE DEBTORS MAY FILE A
CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Fountain View VPL, LLC, Parkway I & II VPL, LLC and NW Spectrum VPL, LLC (collectively, the "Senior Lenders"), hereby move the Court, pursuant to section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code"), for the entry of an order terminating the exclusive periods during which only the above-captioned debtors (collectively,

---

[1] The Debtors in these chapter 11 cases are: (1) ASR-8 Centre LP; (2) ASR-Parkway One & Two, LP; and (3) ASR-Fountainview Place LP.

the "Debtors") may file a chapter 11 plan and solicit acceptances thereof. In support of this motion, the Senior Lenders respectfully represent as follows:

**Preliminary Statement**

1. For the past 12 months, the Debtors have pursued a thus-far fruitless quest to sell their properties at a price that would yield a recovery to their equity holders. In October of last year, the Debtors claimed they had a buyer for the Fountainview Place property but needed the Senior Lenders to agree to forebear so they could consummate the sale. Although the Senior Lenders accommodated this request, no sale materialized. Now, nearly four months later, the Debtors are continuing to pursue a private sale process managed by their owners without success. In fact, as of the date hereof, there is no agreement to sell the properties. The Debtors have indicated that they will abandon any sale process and instead pursue a cram down plan of reorganization if they are unable to find a buyer willing to pay a purchase price that renders them solvent. The Debtors are simply unwilling to commit to a sale process that does not guarantee their owners a return.

2. The Debtors' strategy calls into question for whose benefit these cases are being administered. As discussed below, the Debtors' insiders received more than $2.5 million in transfers of the Senior Lenders' cash collateral in the year prior to the filing of these cases. It is therefore not surprising that the Debtors are intent on holding out for a sale price that pays all creditors in full. It would not only generate a return for the Debtors' owners but would also eliminate potentially material fraudulent transfer claims against them. The Senior Lenders have grave concerns that this conflict of interest creates the possibility that reasonable bids for the properties, which would benefit the Debtors' creditors (but not the Debtors' owners), may not be considered or encouraged.

3. In order to advance these cases and to maximize the value of the Debtors' properties, the Senior Lenders stand ready to propose a plan that seeks to sell the Debtors' properties to the highest bidder pursuant to reasonable bidding procedures. The Senior Lenders believe that this is in the best interests of the Debtors' estates because, in the current Houston real estate market, the properties are likely more valuable sold than operated by the Debtors. It is important that any further delays in selling the properties are avoided so that the properties can be sold in the current, favorable real estate market and the costs of these single asset real estate cases can be minimized.

4. Further, the Senior Lenders submit that it would be inequitable to permit the Debtors to continue to own and operate the properties under a cram down plan, which has no hope of being confirmed. The Debtors have shown that they are poor stewards of the Senior Lenders' collateral, having transferred millions of dollars of rent proceeds to their insiders while failing to pay their debt obligations or properly maintaining the properties.

5. The Senior Lenders request that this Court immediately terminate the Debtors' exclusivity period pursuant to section 1121(d)(1) to permit the Senior Lenders to propose a plan.

**Factual Background**

6. On January 6, 2014 (the "Petition Date"), the Debtors commenced these bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their properties as debtors in possession pursuant to section 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

7. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

8. The Debtors are single asset real estate debtors that own commercial office and retail space. In particular, (a) Debtor ASR-Parkway One & Two, LP owns two office buildings located at 800 and 888 West Sam Houston Parkway South, Houston, Texas (together, the "Parkway Property"); (b) Debtor ASR-Fountainview Place LP owns an office building located at 2640 and 2650 Fountain View Drive, Houston, Texas (the "Fountainview Place Property"); and (c) Debtor ASR-8 Centre LP owns a retail property originally constructed as a flex-office building located at 11755 West Little York Road, Houston, Texas (the "NW Spectrum Property"). The Debtors' properties are operated and managed by their non-debtor affiliate, American Spectrum Management Group, Inc.

*Senior Indebtedness*

9. All of the Debtors' assets are pledged as collateral to secure the Debtors' obligations to the Senior Lenders under certain promissory notes. A summary of the notes and deeds of trust securing the Debtors' obligations associated therewith (collectively, the "Senior Indebtedness") is provided below.

    a. **Parkway Loan**. Debtor ASR-Parkway One & Two, L.P. ("ASR-Parkway") and Senior Lender Parkway I & II VPL, LLC (as assignee of ViewPoint Bank, N.A. ("Viewpoint")) are parties to that certain promissory note dated December 29, 2005 in the original principal amount of $5,000,000 (the "Parkway Loan"), secured by, among other things, the liens, security interests and terms and provisions contained within a deed of trust dated December 29, 2005 (the "Parkway Deed of Trust"). As of the Petition Date, ASR-Parkway owed obligations to Parkway I & II VPL, LLC in respect of the Parkway Loan of at least $4.6 million.

    b. **Fountainview Place Loans**. Debtor ASR-Fountainview Place LP ("ASR-Fountainview Place") and Senior Lender Fountain View VPL, LLC (as assignee of ViewPoint) are parties to two promissory notes dated April 29, 2008 in the original principal

amounts of $12,750,000 and $1,700,000 (the "Fountainview Place Loans"), secured by, among other things, the liens, security interests and terms and provisions contained within deeds of trust dated April 29, 2008 (the "Fountainview Deeds of Trust").  As of the Petition Date, ASR-Fountainview Place owed obligations to Fountain View VPL, LLC in respect of each of the Fountainview Place Loans of at least $13.1 million and $836,000.

                c.      **Spectrum Loan**.  Debtor ASR-8 Centre LP ("ASR-8 Centre") and Senior Lender NW Spectrum VPL, LLC (as assignee of ViewPoint Bank) are parties to that certain promissory note dated March 29, 2013 in the original principal amount of $4,500,000 (the "Spectrum Loan"), secured by, among other things, the liens, security interests and terms and provisions contained within a deed of trust dated March 29, 2013 (the "Spectrum Deed of Trust" and, together with the Parkway Deed of Trust and the Fountainview Deed of Trust, the "Deeds of Trust").  As of the Petition Date, ASR-8 Centre owed obligations to NW Spectrum VPL, LLC in respect of the Spectrum Loan of at least $4.8 million.

        10.      The Debtors have been in default of their obligations under the Senior Indebtedness since at least April 2013.  The events of default include, among other things, the failure to make required payments in respect of the Senior Indebtedness, the misappropriation of rents in violation of the Deeds of Trust and the grant of additional liens on certain of the properties.

        11.      On September 30, 2013, the Senior Lenders acquired all of ViewPoint's rights and interests in respect of the Senior Indebtedness.

***The Debtors Transferred Millions of Dollars of the Senior Lenders' Collateral to Their Affiliates***

        12.      As of the Petition Date, the Debtors had made no payments of principal or interest in respect of the Senior Indebtedness since at least April 2013.  They also failed to pay

significant operating expenses, including those of utilities and other vendors, prior to the commencement of these cases, as demonstrated by the Debtors' schedules of assets and liabilities. And, the Debtors did not incur routine maintenance costs at the properties, including approximately $400,000 of upgrades at the Fountainview Place Property needed to ensure that the building complies with applicable fire codes and regulations.

13. The Debtors instead transferred more than $2.5 million of rental proceeds, which constitutes the Senior Lenders' collateral, to their affiliates in blatant disregard of the terms of the Deeds of Trust.[2] In point of fact, according to the Debtors' statement of financial affairs,[3] in just the one year period prior to the Petition Date, (a) ASR-Fountainview Place transferred more than $1.7 million, (b) ASR-Parkway transferred more than $550,000 and (c) ASR-8 Centre transferred more than $318,000, to insiders.[4] The vast majority of the transfers appear to have been made to the Debtors' owners and other affiliates for no consideration, although a few of them appear to constitute payments of management fees.

***The Debtors Appear to Be Administering These Chapter 11 Cases For the Benefit of Their Owners***

14. Because the Debtors were actively seeking to sell their properties just prior to the Petition Date, at the inception of these cases, the Senior Lenders offered to permit the

---

[2] Under the Deeds of Trust, each Debtor assigned all rents from the properties to the Senior Lenders and retained only a limited license to use rents for specified purposes. (Deeds of Trust § 9.1-.2.) Specifically, each Debtor "agree[d] to receive all Rents and hold the same as a trust fund to be applied, and to apply the Rents so collected, first to the payment of the Indebtedness, next to the performance and discharge of the Obligations, and next to the Payment of Operating Expenses." (Deeds of Trust § 9.2.)

[3] (See D.I. 52, 54 and 57, Attachment A).

[4] The Debtors' responses to Question 3.c. of the statements of financial affairs are deficient. While it is clear that the Debtors transferred a material amount of rental proceeds to affiliates, the Debtors fail to identify the entities that received the transfers. At the section 341 meeting, counsel to the Senior Lenders asked James L. Hurn, who is the Vice President and General Counsel of each of the Debtors and the General Counsel and director of American Spectrum Realty Inc., the publically-traded ultimate parent company of each of the Debtors, to identify which entities received the transfers and to generally explain why the transfers were made. Mr. Hurn was unable to do so.

Debtors to use the Senior Lenders' cash collateral to fund a section 363 sale process.  The Senior Lenders believed that avoiding any delay in pursuing a sale process was in the best interest of the Debtors' estates because of the favorable market conditions that existed at that time.  Nonetheless, the Debtors indicated that they would not commit to a sale because they wanted to evaluate whether or not a cram down plan was feasible.

15. Almost sixty days into these single asset real estate cases, the Debtors have made no progress.[5]  They remain unwavering in their refusal to commit to a sale of the properties to the highest bidder at a bankruptcy auction.  Instead, the Debtors continue to pursue a private sale process run by the insiders who received significant fraudulent transfers of the Senior Lenders' collateral.  The Debtors' apparent strategy is to try to sell the properties, but only at a price that rescues them from insolvency, generates a material return for their owners and insulates them from fraudulent transfer attack.  If a "home run" purchase offer does not materialize, the Debtors will forgo any sale and instead seek to continue operating the properties under a cram down plan of reorganization.

16. The Debtors have been actively marketing and attempting to sell the Fountainview Place Property for about a year and the Parkway Property and the NW Spectrum Property for about two to three months.  Although the Debtors have stated there is interest from buyers in some of the properties, to date the Debtors have not filed a motion seeking to approve a sale of any of the properties or reached a binding agreement to sell any of the properties.[6]

---

[5] In addition, the Debtors still have not provided the Senior Lenders with certain basic information they requested more than thirty days ago pursuant to the cash collateral order, including copies of the Debtors' bank statements and ARGUS cash flow files.  Although the Debtors claim they are unable to produce the requested files because they purportedly do not use ARGUS software, the Senior Lenders received such files prior to the Petition Date.

[6] At the section 341 meeting, the Debtors stated that within a few days they intended to file a motion seeking approval of the sale of the land tract owned by ASR-8 Centre.  However, no such motion has been filed to date.

**Argument**

17. Chapter 11 of the Bankruptcy Code replaced Chapter XI of the former Bankruptcy Act of 1898. Under the old Chapter XI, debtors had the exclusive right to propose a plan of reorganization throughout the entire case. This led to significant abuses by debtors, who could threaten to liquidate if their plan was not accepted, resulting in even worse recoveries than under their plan. In this way debtors could force their plans on creditors rather than engage in genuine good faith negotiations.

18. The House Report accompanying H.R. 8200 (the law enacting the 1978 Bankruptcy Code) makes clear that Congress believed that exclusive control by the debtor had been detrimental to the reorganization process. It states that "the exclusive right [under old Chapter XI] gives the debtor undue bargaining leverage, because by delay [the debtor] can force a settlement out of otherwise unwilling creditors." H.R. Rep. No. 95-595, 95th Cong., 1d Sess. 231 (1977), reprinted in 1978 U. S. Code Cong. & Admin. News 6191; see also In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409 (E.D.N.Y. 1989) ("[T]he present Section 1121 seeks to cure the prior practice that gave debtors undue bargaining leverage to delay.") (internal citations omitted); In re Washington-St. Tammany Electric Cooperative, Inc., 97 B.R. 852, 855 (E.D. La. 1989) ("Congress enacted 11 U.S.C. § 1121 in order to limit the debtor's exclusive rights to file a plan.").

19. Section 1121 of the Bankruptcy Code provides who may file a chapter 11 plan and the time period during which a debtor has the exclusive right to file a plan. Section 1121(b) gives the debtor the exclusive right to file a plan of reorganization for an initial period of 120 days. See 11 U.S.C. §§ 1121(b), (c). Congress specifically granted a bankruptcy court the ability to decide whether 120 days is the right amount of time for a debtor to have the sole right to file a plan, providing in section 1121(d)(1) that "the court may for cause **reduce** or

increase the 120-day period." 11 U.S.C. § 1121(d)(1) (emphasis added).   In enacting section 1121, Congress emphasized that creditors must have a say in designing a reorganization plan because they are the ones whose money is at stake.  H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 231-32, reprinted in 1978 U. S. Code Cong. & Admin. News 1978, 5963, 6191 ("[T]he bill recognizes the legitimate interests of creditors, whose money is in the enterprise, as much as the [interests of] debtors, to have a say in the future of the company."); see also In re Timbers of Inwood Forest Assocs., Ltd., 808 F.2d 363, 372 (5th Cir. Tex. 1987), aff'd sub nom. United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365 (1988) (same); In re Lehigh Valley Prof'l Sports Clubs, Inc., 2000 Bankr. LEXIS 237, at *12 (Bankr. E.D. Pa. Mar. 14, 2000) (same); In re Gibson & Cushman Dredging Corp., 101 B.R. at 409 (Congress placed limits on a debtor's exclusivity in the new 1978 Bankruptcy Code "in recognition of the creditor's stake in the debtor's business").

20. The Bankruptcy Code does not define "cause," leaving the decision to the discretion of the court on a case-by-case basis.  See In re Geriatric Nursing Home, Inc., 187 B.R. 128, 132 (D.N.J. 1995) (section 1121(d)(1) "grants great latitude to the Bankruptcy Judge in deciding, on a case-specific basis, whether to modify the exclusivity period on a showing of 'cause.'") (citation omitted); see also In re Adelphia Commn'ns Corp., 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific.").

21. Given Congress' clear intent in enacting section 1121, courts have recognized that they must "avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under old Chapter XI." In re Southwest Oil Co., 84 B.R. at 450; see also In re Timbers of Inwood Forest Assocs. Ltd., 808 F.2d at 372; In re Lehigh Valley Prof'l

Sports Clubs, Inc., 2000 Bankr. LEXIS 237, at *11 ("In passing upon a request for a change in the debtor's exclusivity period, the court needs to consider more than just the articulated cause presented to it. It must also consider the history and purpose of § 1121 and the competing interests which Congress sought to balance when it enacted these time tables.").

22. Many courts interpreting and applying section 1121(d) employ a fairly standard list of potential factors to be examined as indicia of whether "cause" has been demonstrated:

> (a) the size and complexity of the case; (b) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists.

In re Express One Int'l, Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); In re Dow Corning Corp., 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997); In re Adelphia Commcn's Corp., 336 B.R. 610, 674 (Bankr. S.D.N.Y.), aff'd, 342 B.R. 122 (S.D.N.Y. 2006).

I. *There Is "Cause" Within the Meaning of Section 1121(d)(1) to Warrant Termination of the Debtors' Exclusivity Period*

23. The circumstances of these cases favor terminating the Debtors' exclusivity period. See In re Pub. Serv. Co. of N.H., 88 B.R. 521, 537 (Bankr. D.N.H. 1988) (assessing existence of an "alternate substantial plan being held off by debtor" in determining whether to terminate exclusivity). As explained below, (a) most of the Express One factors support termination (or are irrelevant), (b) terminating exclusivity will move the cases towards a fair resolution and (c) terminating exclusivity will not prejudice the Debtors.

A. **Application of the <u>Express One</u> Factors Support Termination**

24. An evaluation of the following relevant <u>Express One</u> factors demonstrates that the Debtors' exclusive period to propose a plan should be terminated: (a) these cases are straightforward single asset real estate cases, which are not overly complex, unique or large, (b) in light of the nature of these cases (and the fact that the Debtors have been in default for more than 11 months), the Debtors have had ample time to identify the essential players, their goals, and the key issues to be resolved under a plan,[7] (c) the Debtors' actions both prior to and during these cases strongly suggests that negotiations are unlikely to yield progress towards a plan of reorganization, (d) upon information and belief, the Debtors are not involved in any negotiating with their creditors regarding a plan, (e) the Debtors' refusal to commit to a sale of the properties is needlessly delaying these cases and (f) there are no unresolved contingencies that require delay of the proposal of a plan. Accordingly, on the balance of the factors alone, there is sufficient cause to terminate the Debtors' exclusivity.

B. **Terminating Exclusivity Will Advance These Cases**

25. In addition, a key consideration in determining whether to terminate exclusivity is whether it "will move the case forward," which amounts to "'a practical call that can override a mere toting up of the factors.'" <u>In re Adelphia Commc'ns Corp.</u>, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) (quoting <u>In re Dow Corning Corp.</u>, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997)). In other words, "the test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case. Certainly practical considerations, or other considerations in the interests of justice, could

---

[7] Indeed, in the context of a single asset real estate case, Congress recognized that a plan could be filed quickly. <u>See</u> 11 U.S.C. § 362(d)(3) (automatically lifting the automatic stay in circumstances where a debtor has failed to make interest payments or file a viable plan within 90 days of the petition date).

override, in certain cases, the result after analysis of the nine factors." Id. Indeed, courts have recognized that "a transcendent consideration is whether adjustment of exclusivity will facilitate moving the case forward toward a fair and equitable resolution." In re Henry Mayo Newhall Mem'l Hosp., 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002).

26.     The private sale process that the Debtors have already been pursing for a year will not lead to a fair and equitable resolution of these cases.  To the contrary, the Debtors' focus on obtaining a sale price for the properties that would generate a material return for the Debtors' owners is misguided and calls into question for whose benefit these cases are being administered.  In order to advance these cases and to maximize the value of the Debtors' properties, the Senior Lenders should be permitted to propose their own plan.

27.     In addition, a sale of the properties to the highest bidder represents an "equitable resolution" of the cases.  Prior to these cases, the Debtors failed to pay their creditors, including the Senior Lenders, not because they did not have sufficient cash flow to do so but because they transferred their cash to their affiliates in clear violation of the Deeds of Trust.  In light of the Debtors' actions both prior to and during these cases, it is entirely appropriate to terminate the Debtors' exclusivity and permit other parties to propose a resolution of these cases.

C.      **Terminating Exclusivity Will Not Prejudice the Debtors**

28.     If the Debtors decide to propose a plan, termination of exclusivity will not foreclose that opportunity. See In re R.G. Pharmacy, Inc., 374 B.R. 484, 488 (Bankr. D. Conn. 2007) ("The fact that the debtor no longer has the *exclusive* right to file a plan does not affect its concurrent right to file a plan."); In re All Seasons Indus. Inc., 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990) (denial of request for extension of the exclusivity period is not the "death knell" for a debtor's reorganization; a debtor remains free to take as long as it feels to develop and propose its own plan, through from that point onward, creditors have the same rights).

**Notice**

29.     Notice of this motion has been given to:  (a) counsel to the Debtor; (b) the Office of the United States Trustee for the Southern District of Texas; and (c) parties who entered a notice of appearance pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Senior Lenders submit that no other or further notice is required.

WHEREFORE, the Senior Lenders respectfully request that the Court enter an order substantially in the form attached hereto as <u>Exhibit A</u> (a) terminating the exclusive periods during which only the Debtors may file a chapter 11 plan and solicit acceptances thereof and (b) granting such other and further relief as the Court may deem proper.

Dated:  March 3, 2014

Respectfully submitted,

<u>/s/Daniel B. Prieto</u>
Daniel B. Prieto (Texas Bar No. 24048744 )
JONES DAY
2727 N. Harwood
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (832) 239-5100
dbprieto@jonesday.com

- and -

Paul M. Green (Texas Bar No. 24059854)
JONES DAY
717 Texas Avenue, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-5100
pmgreen@jonesday.com

ATTORNEYS FOR
SENIOR LENDERS

HUI-166147v5